IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| CHRIS HOGAN,<br><br>      Plaintiff,<br><br><br><br><br><br>                   vs.<br><br><br>UTAH TELECOMMUNICATION OPEN INFRASTRUCTURE AGENCY, AKA UTOPIA,<br><br>AND<br><br>TODD MARRIOT, EXECUTIVE DIRECTOR OF UTAH TELECOMMUNICATION OPEN INFRASTRUCTURE AGENCY<br><br>AND<br><br>DOES 1-5<br><br><br>      Defendants. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND DENYING PLAINTIFF'S MOTION TO STRIKE<br><br><br><br><br><br><br><br><br><br><br><br>Case No. 1:11-CV-64 TS |

This matter is before the Court on Defendants Utah Telecommunication Open

Infrastructure Agency ("UTOPIA") and Todd Marriott's (collectively "Defendants") Motion to

Dismiss[1] and Plaintiff Chris Hogan's Motion to Strike.[2]  For the reasons discussed more fully

below, the Court will grant in part and deny in part Defendants' Motion to Dismiss and will deny

Plaintiff's Motion to Strike.

## I.  BACKGROUND

The following facts are taken from Plaintiff's Amended Complaint.  Plaintiff's

Complaint centers around actions allegedly taken by UTOPIA, an inter-local cooperative entity

and political subdivision of the State of Utah, and Mr. Marriott—a Utah resident—who serves as

UTOPIA's executive director.  Plaintiff is a citizen of the State of Colorado.

Plaintiff alleges that, on or about May 9, 2009, he entered into an agreement with

UTOPIA (the "Agreement") to provide his services as an independent contractor.  According to

Plaintiff, he had already been working for UTOPIA for almost a year when he entered into the

Agreement.  Under the terms of the Agreement, Plaintiff was to provide certain services

including "sales, marketing, business development, operations, IT, and engineering efforts

regarding the UTOPIA network."[3]  In exchange, Plaintiff was to receive $11,500 per month.   By

its terms, the Agreement was to expire in May of 2011.  Plaintiff asserts that despite the

termination clause in the Agreement, Mr. Marriott and UTOPIA's general counsel, David Shaw,

led Plaintiff to believe that the Agreement would be renewed.

---

[1]Docket No. 19.

[2]Docket No. 27.

[3]Docket No. 24, Ex. A, at 1-2.

Though not included in the terms of the Agreement, UTOPIA also provided Plaintiff an apartment to live in during the week, for which it paid both the utilities and internet.  UTOPIA also provided Plaintiff with an office, computer, and cell phone, none of which were provided for under the Agreement.

Plaintiff alleges that his duties with UTOPIA included:

> developing sales, marketing, developments functions for UTOPIA in the business and consumer markets, branding, marketing strategy and plan, hiring, hiring of employees, developing marketing, hiring partner agencies, conducting requests for proposal processes to secure partners, liaising with all of UTOPIA's partners and stakeholders, meeting with city officials to attract new member cities to UTOPIA, making presentation about UTOPIA, meeting with strategic partners both inside and outside of UTOPIA, attracting and developing new service providers and application providers to the UTOPIA network, helping to develop the business model for the organization, and actively participating in board and executive committee meetings.[4]

Plaintiff alleges that Utopia dictated the pace and sequence of how he performed his job and also set the hours he worked.  According to Plaintiff, as the head of multiple departments, he was able to delegate his functions.  In early 2011, Plaintiff was made the Director of Operations for UTOPIA.  This meant that Plaintiff also became responsible for such processes as customer care, service provider support, trouble ticketing, installation and customer fulfillment, billing, and other similar processes.  Plaintiff acknowledges that throughout the term of his contract he was a 1099 contractor and maintained separate business and tax records.

Plaintiff alleges that the negative employment actions taken against him were in retaliation for statements Plaintiff made to Mr. Jared Pantier, an outside plant manager and

---

[4]*Id*. at 4-5.

3

UTOPIA employee, who also reports directly to Mr. Marriott.  Plaintiff had suspicions that

UTOPIA, through Mr. Marriott, may be engaging in anti-competitive bidding practices.  Plaintiff

asserts that his suspicions were based on the involvement of Tetra Tech, a company for which

Mr. Marriott's brother serves on the upper management for the region of Utah.  According to

Plaintiff, Tetra Tech is a company with a disfavored status with UTOPIA.  Plaintiff became

suspicious when Tetra Tech submitted bid amounts that were extremely close to the projected

cost amounts developed by UTOPIA.  UTOPIA later terminated the bidding process in which

Tetra Tech had directly been involved.  However, Plaintiff alleges that it was his understanding

that Tetra Tech had discussed working under another general contractor, Corning Incorporated.

Plaintiff asserts that he spoke with Mr. Pantier about his suspicions, instead of filing a

report with the authorities, because he acknowledged that he could be wrong and decided to be

cautious before accusing Mr. Marriott and Tetra Tech of engaging in anti-competitive bidding

practices.  Plaintiff alleges:

> In order to make sure the bidding process did not jeopardize the success of
> UTOPIA and in hopes of making the process transparent, [Plaintiff] suggested to
> [Mr.] Pantier that he ensure that the Executive Board knew about the relationship
> between Tetra Tech and [Mr.] Marriott as well as the possibility that Corning,
> Incorporated, may be having discussions with Tetra Tech about awarding the curb
> to home subcontract to Tetra Tech.[5]

Plaintiff alleges that soon thereafter, Mr. Marriott requested that Plaintiff sign a

termination agreement.  Plaintiff asserts that he would not sign the termination agreement and, as

a result, Mr. Marriott began sending texts to Plaintiff's wife's cell phone warning Plaintiff to

---

[5]Docket No. 24, at 10.

keep quiet about UTOPIA's dealings.  Plaintiff further alleges that Defendants attempted to have him evicted from the apartment he lived in during the week and locked him out of the UTOPIA office he used.  Plaintiff also believes that, after he refused to sign the termination agreement, a member of UTOPIA's executive staff told UTOPIA employees that Plaintiff had been committing crimes.

Plaintiff also makes various allegations about being removed from a separate company in which he was involved with Mr. Marriott and Mr. Shaw, a non-profit corporation entitled "GigNation."

Plaintiff subsequently sought legal advice and directed counsel to serve a draft complaint on the executive—Plaintiff alleges managing—board of UTOPIA.  Plaintiff asserts that the draft complaint was accompanied by a letter notifying UTOPIA that Plaintiff intended to file a lawsuit but was open to negotiating a mutually acceptable resolution instead of litigation.  Plaintiff alleges that, in response, he received a letter from Mr. Marriott, indicating that "your actions specific to recent interactions with Mr. Jarrod (sic) Pantier are clearly outside the scope of that certain Professional Services Agreement, together with applicable Statements of Work, dated as of May 12, 2009."[6]  Plaintiff subsequently sent a demand letter to UTOPIA's executive board on March 24, 2011.  Mr. Shaw responded to Plaintiff's demand letter on April 4, 2011, and, according to Plaintiff, denied all of Plaintiff's claims.

Plaintiff has attached as an exhibit to his Amended Complaint a redacted version of this response to his demand letter and alleges that he has redacted the letter because the Utah Third

---

[6]Docket No. 24, Ex. C, at 1.

District Court found the paragraphs to be redundant, immaterial, impertinent, or scandalous. Defendants attached the same letter to their Answer to Plaintiff's Amended Complaint and Motion to Dismiss, without redactions.

## II.  STANDARD OF REVIEW

In considering a motion to dismiss under Rule 12(b)(6), all well-pleaded factual allegations, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to Plaintiff as the nonmoving party.[7]  Plaintiff must provide "enough facts to state a claim to relief that is plausible on its face."[8]  All well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party.[9]  But, the court "need not accept . . . conclusory allegations without supporting factual averments."[10]  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[11]  The Supreme Court has

---

[7] *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002).

[8] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).

[9] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[10] *S. Disposal, Inc., v. Tex. Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[11] *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

explained that a plaintiff must "nudge[ ][his] claims across the line from conceivable to plausible" to survive a motion to dismiss.[12]

> Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims.[13]

The Supreme Court recently provided greater explanation of the standard set out in *Twombly* in *Ashcroft v. Iqbal*.[14]  In *Iqbal*, the Court reiterated that while FED.R.CIV.P. 8 does not require detailed factual allegations, it nonetheless requires "more than unadorned, the-defendant-unlawfully-harmed-me accusation[s]."[15]  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"[16]  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[17]

The Court in *Iqbal* stated:

> Two working principles underlie our decision in *Twombly*.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed

---

[12] *Twombly*, 550 U.S. at 547.

[13] *The Ridge at Red Hawk, LLC  v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).

[14] 556 U.S. 662 (2009).

[15] *Id*. at 1949.

[16] *Id*. (quoting *Twombly*, 550 U.S. at 555).

[17] *Id*. (quoting *Twombly*, 550 U.S. at 557).

with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief.

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[18]

In considering the adequacy of a plaintiff's allegations in a complaint subject to a motion to dismiss, a district court not only considers the complaint, but also "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[19]  Thus, "notwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss, '[a] district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'"[20]

---

[18]*Id*. at 1949-50 (internal quotation marks and citations omitted).

[19]*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B WRIGHT & MILLER § 1357 (3d ed. 2004 & Supp. 2007)).

[20]*Alvarado v. KOBTV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).

III.  DISCUSSION

Defendant moves this Court to dismiss Plaintiff's first, second, fourth, fifth and sixth causes of action of Plaintiff's Amended Complaint for failure to state a claim for which relief may be granted.  Plaintiff contends that, accepting the allegations in his Amended Complaint as true, viewing them in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor, Plaintiff has stated a claim upon which relief may be granted as to each of the claims listed above.  Plaintiff also moves the Court to strike four paragraphs from pleadings submitted by Defendants.  The Court will address each of the claims individually.

A.     FIRST AMENDMENT

Defendant alleges that Plaintiff's first cause of action—for violation of his right of speech under the First and Fourteenth Amendment of the United States Constitution, brought pursuant to 42 U.S.C. § 1983—fails because the speech for which Plaintiff allegedly suffered retaliation was made in his official duties and did not pertain to a matter of public concern.  Defendants also assert that their interests in providing efficient public service outweighs Plaintiff's interest in the speech in question.

"[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."[21]  There is some dispute in this action whether, in application, Plaintiff was an independent contractor or employee.  However, for purposes of the First Amendment analysis, the Supreme Court has previously found no

---

[21]*Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

9

"difference of constitutional magnitude between independent contractors and employees."[22]  The

Supreme Court further held that, for First Amendment speech purposes, "[i]ndependent

government contractors are similar in most relevant respects to government employees" and "the

same form of balancing analysis should apply to each."[23]

The balancing analysis the Court must weigh to determine whether Plaintiff was denied

his constitutional rights is referred to as the Pickering test, or the Garcetti/Pickering analysis.[24]

> The test comprises five elements, called 'prongs': (1) whether the speech was
> made pursuant to an employee's official duties; (2) whether the speech was on a
> matter of public concern; (3) whether the government's interests, as employer, in
> promoting the efficiency of the public service are sufficient to outweigh the
> plaintiff's free speech interests; (4) whether the protected speech was a motivating
> factor in the adverse employment action; and (5) whether the defendant would
> have reached the same employment decision in the absence of the protected
> conduct.[25]

"The first three steps of the Garcetti/Pickering analysis are issues of law 'to be resolved by the

district court, while the last two are ordinarily for the trier of fact.'"[26]  Under the

Garcetti/Pickering analysis the Court must first analyze whether the speech occurred pursuant to

---

[22]*Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan., v. Umbehr*, 518 U.S. 668, 684 (1996).

[23]*Id.* at 684-85.

[24]*See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 (10th Cir. 2007).

[25]*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009) (citing *Brammer-Hoelter*, 492 F.3d at 1202-03).

[26]*Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 745 (10th Cir. 2010) (quoting *Brammer-Hoelter*, 492 F.3d at 1203).

the public employee Plaintiff's official duties and the inquiry ends after that initial step if the court answers this legal question in the affirmative.[27]

In determining whether speech is made pursuant to an employee's official duties "the Tenth Circuit has taken a case-by-case approach, looking both to the content of the speech, as well as the employee's chosen audience."[28]

> [T]he court has focused on whether the speech activity stemmed from and was of the type that the employee was paid to do and has highlighted that the ultimate question in determining whether speech falls within an employee's official duties is whether the employee speaks as a citizen or instead as a governmental employee. [29]

"Consequently, if an employee engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties."[30]

In the instant action, Plaintiff voiced his suspicions to a fellow employee that UTOPIA, through Mr. Marriott, may be engaging in anti-competitive bidding practices with a company—Tetra Tech—in which Mr. Marriott's brother is involved in an upper management position. The parties dispute whether the content of Plaintiff' statements were within the scope of his official duties.

---

[27]*See Hesse v. Town of Jackson, Wyo.*, 541 F.3d 1240, 1249 (10th Cir. 2008).

[28]*Rohrbough*, 596 F.3d at 746.

[29]*Id*. (internal quotations and citations omitted).

[30]*Brammer-Hoelter*, 492 F.3d at 1203.

Plaintiff asserts that a letter sent to Plaintiff from Mr. Marriott after the statements in question were made is dispositive on this issue.  In the letter, Mr. Marriott indicates to Plaintiff that his "actions specific to recent interactions with Mr. Jarrod [sic] Pantier are clearly outside the scope of that certain Professional Services Agreement, together with applicable Statements of Work, dated as of May 12, 2009."[31]  Plaintiff argues that this comment by Mr. Marriott establishes that his statements to Mr. Pantier were outside of the scope of his official duties as such statements were not made pursuant his Agreement.[32]

The Tenth Circuit has indicated that its "precedents since *Garcetti* have taken a broad view of the meaning of speech that is pursuant to an employee's official duties."[33]  Moreover, "speech may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform."[34]  Therefore, Mr. Marriott's assertion that Plaintiff's actions with regard to Mr. Pantier were clearly outside the scope of the Agreement, is not dispositive of whether Plaintiff was acting pursuant to his official duties in making his statements to Mr. Pantier.[35]  Rather, if the speech "reasonably contributes to or facilitates the

---

[31]Docket No. 24, Ex. C, at 1.

[32]In oral argument, Defendants argued that the letter from Mr. Marriott was not focused on the statements made by Plaintiff, rather, it was focused on the insubordinate action of Plaintiff in taking his allegations to a fellow employee.  On this argument alone, the Court is persuaded that the letter from Mr. Marriott is not dispositive on this issue.

[33]*Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008) (internal quotations omitted).

[34]*Brammer-Hoelter,* 492 F.3d at 1192, 1203.

[35]*See Thomas*, 548 F.3d 1323-24 ("In this case, Mr. Thomas's supervisor, Monte Ketchum, conceded that Mr. Thomas's official duties did not include a duty to contact the OSBI

12

employee's performance of the official duty, the speech is made pursuant to the employee's official duties.[36]

Plaintiff indicates in his Amended Complaint that he made the statement's in question "[i]n order to make sure the bidding process did not jeopardize the success of UTOPIA and in hopes of making the process transparent, [Plaintiff] suggested to Pantier that he ensure that the Executive Board knew about the relationship between Tetra Tech and Mr. Marriott."[37] Moreover, Plaintiff explains that his motive in making this suggestion to Mr. Pantier was "to protect the public trust of the citizens of UTOPIA's member cities and of taxpayers whose tax dollars helped to fund UTOPIA, and to prevent UTOPIA from entering into a contract that could be illegal and would endanger UTOPIA's continual success and existence."[38]

The Court finds that the facts of this case are similar to those confronted by the Tenth Circuit in *Casey v. West Las Vegas Independent School District*.[39]   In that case, the court analyzed the statements of the former superintendent of a school district.  The court found that statements made to the board (the superintendent's supervisors) were precluded under *Garcetti* because the superintendent was under an obligation to provide candid advice and counsel to her

––––––––––––––––––––

for perceived criminal violations.  But that is not the end of the matter.  The inquiry is a practical one . . . Therefore the fact that it was not expressly Mr. Thomas's duty to report to the OSBI is not dispositive on whether he was acting pursuant to his duties.") (internal quotations omitted).

[36]*Brammer-Hoelter,* 492 F.3d at 1203.

[37]Docket No. 24, at 10.

[38]*Id.*

[39]473 F.3d 1323 (10th Cir. 2007).

supervisors.[40]  The court went on to hold that statements by the superintendent to the New

Mexico Attorney General "however, are another kettle of fish" because the plaintiff "was not

seeking to fulfill her responsibility of advising the Board when she went to the Attorney

General's office."[41]

      Admittedly, this case is distinguishable from *Casey* because Plaintiff's statements were

not made directly to the executive board.  Instead, Plaintiff made his statements to an

intermediary, Mr. Pantier, and suggested that he speak to the board with regard to his concerns.

Thus, Plaintiff acknowledges that the intended recipient of Plaintiff's statements was the

executive board.  In his Amended Complaint Plaintiff asserts that his duties with UTOPIA

included actively participating in board and executive committee meetings.  Given the extensive

list of duties Plaintiff provides in his Amended Complaint,[42] it is difficult for the Court to foresee

a situation where Plaintiff would not be under an obligation to report a concern regarding

UTOPIA to the board.  Particularly a concern which Plaintiff felt could "endanger UTOPIA's

continual success and existence."[43]   Plaintiff has alleged that he had a duty to actively participate

in board and executive committee meetings and the statements he made to Mr. Pantier were

meant to influence the board.  For these reasons, the Court finds that Plaintiff's statements to Mr.

Pantier were within the scope of his official duties.

---

[40]*Id*. at 1332.

[41]*Id*.

[42]*See* Docket No. 24, at 4.

[43]*Id*. at 10.

Because the Court finds that Plaintiff's statements to Mr. Pantier were within the scope of his official duties, it will dismiss Plaintiff's first cause of action for violation of his free speech rights under the First and Fourteenth Amendment of the United States Constitution.

B.      UTAH CODE ANNOTATED § 67-21-3

Plaintiff's second cause of action is for violation of Utah Code Annotated § 67-21-3 ("§ 67-21-3").  Plaintiff alleges Defendants took an adverse action against him because he communicated in good faith the violation or suspected violation of a law, rule, or regulation adopted under the laws of Utah.  Defendants contend that the Court should dismiss this claim on a number of grounds.  First, Defendants argue that the Court should dismiss the claim because Plaintiff failed to strictly comply with the procedural requirements of the Utah Governmental Immunity Act ("UGIA").  Next, Defendants argue that even if Plaintiff had complied with the requirements of the UGIA, the Court should dismiss this claim because § 67-21-3 only applies to government employees, not to independent contractors.

Without reaching Defendants' other arguments, this Court will dismiss Plaintiff's claim because it is unable to conclude that § 67-21-3 applies to independent contractors.

Utah Code Annotated § 67-21-2(3) provides that "employees" are covered under this Chapter of the Utah Code.  It  provides that "'[e]mployee' means a person who performs a service for wages or other remuneration under a contract of hire, written or oral, express or implied."  Plaintiff asserts that "[i]ndependent contractors fall squarely within this definition," however, he does not cite any case law to support this assertion.[44]

---

[44]Docket No. 29, at 14.

Plaintiff argues that this Court should find "[Plaintiff], an independent contractor, is also an employee under section 67-21-3 because he performed services for UTOPIA for wages or other remuneration under a written contract for hire."[45]  It is undisputed that Plaintiff was hired under a contract to perform services.  However, such contracts are not included within the definition of "employee" for purposes of Utah Code, Title 67, Chapter 21.  In effect, Plaintiff requests that this Court find that a contract for hire, which creates an at-will employment relationship, is synonymous to a contract for services, which results in a contractual relationship.

Employees and independent contractors are not synonymous and are not afforded the same rights of recovery under the law.  For this reason, various courts that have found that statutory protections that apply to employees do not apply to independent contractors.[46]  Moreover, the Court notes that other Utah statutes that have used substantially the same language to define employee—specifically the language "contract of hire"—have not included independent contractors under that definition.[47]

---

[45]*Id*.

[46]*See IOSTAR Corporation v. Stuart*, 2009 WL 270037, at *18 (D. Utah Feb. 3, 2009) (holding that the wrongful discharge doctrine grew out of a need to protect at-will employees and does not protect independent contractors); *Vesom v. Atchison Hosp. Ass'n*, 2006 WL 2714265, at *25 (D. Kan. Sep. 22, 2006) *aff'd*, 279 Fed. Appx. 624 (10th Cir. 2008) *cert. denied*, 129 S. Ct. 459 (2008) (finding independent contractor not protected by Kansas whistle blower statute, because the tort is only an exception to the employment-at will doctrine and is based on the wrongful conduct of an entity with the power to terminate the employee).

[47]See Utah Code Annotated § 34A-2-104(1)(b)(i) & (5).  *Compare* section (1) specifying that an employee is a person in the service of any employer under any contract of hire, express or implied *with* section (5) explaining that an employee does not include various positions including independent contractors.

The Court agrees that "[t]he purpose of statutory construction is to 'give effect to the Legislature's intent.'"[48]  Given the dearth of support for Plaintiff's asserted position, the Court is unwilling to find that the Legislature intended its definition of "employees" for purposes of this act to include independent contractors.  For this reason, the Court will dismiss Plaintiff's claim under § 67-21-3.

C.      GOOD FAITH AND FAIR DEALING

Plaintiff's fourth cause of action is for violation of the covenant of good faith and fair dealing.  Plaintiff alleges in this claim that Defendants violated the covenant of good faith and fair dealing when they (1) unilaterally terminated the Agreement; (2) immediately thereafter hired one of Mr. Marriott's neighbors, Gary Jones, to replace Plaintiff in the role of Marketing Director; (3) locked Plaintiff out of his office computer and company cell phone; (4) announced his termination to all UTOPIA employees; and (5) attempted to lock Plaintiff out of the apartment rented for Plaintiff by Defendants.  Defendants argue that this claim fails because, through these allegations, Plaintiff is attempting to create rights that the Agreement does not provide.  Moreover, Defendants argue that none of these allegations support a finding of the breach of covenant of good faith and fair dealing because they occurred after the alleged termination of the Agreement.

---

[48]Docket No. 29, at 13 (quoting *Progressive Cas. Ins. Co., v. Ewart*, 167 P.3d 1011, 1014 (Utah 2007).

Parties to a contract must exercise their contractual rights in good faith.[49]  Good faith and fair dealing means the parties must be faithful to the "'agreed common purpose'" and consistent with "'the justified expectations of the other party.'"[50]  The covenant cannot, however, "be read to establish new, independent rights or duties to which the parties did not agree ex ante."[51]

In the instant case, Plaintiff alleges numerous violations of the covenant of good faith and fair dealing.  The Court notes that Plaintiff may be unable to prove that each of these allegations constitutes a violation of the covenant of good faith and fair dealing.  However, to the extent the Defendants took actions that would prevent Plaintiff from performing his obligations under the Agreement, such is sufficient to maintain an action for breach of the covenant of good faith and fair dealing.

Because Plaintiff had a justified expectation that he would be allowed to perform his obligations under the Agreement, the Court will deny Defendants' Motion to Dismiss Plaintiff's fourth cause of action for violation of the covenant of good faith and fair dealing.

D.    WRONGFUL DISCHARGE

Plaintiff's fifth cause of action is for wrongful discharge in violation of public policy. Plaintiff alleges that Defendants' actions violated Utah's strong public policy preventing government employers from retaliating against their employees for communicating their concerns

---

[49]*See Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991).

[50]*Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.*, 889 P.2d 445, 451 (Utah Ct. App. 1994) (quoting Restatement (Second) of Contracts § 205 cmt. a (1979)).

[51]*Oakwood Village LLC v. Albertsons, Inc.*, 104 P.3d 1226, 1240 (Utah 2004) (internal citations omitted).

that the employer may be engaging in, or is about to engage in, illegal activities.  Plaintiff also alleges that he acquired a significant legal right when he contracted with UTOPIA to provide his professional services as an independent contractor and that Defendants violated the public policy requiring the parties to a contract to perform the terms of contract in good faith and with fair dealing.  Defendants argue that this claim should be dismissed because a claim under the tort of wrongful discharge does not apply to independent contractors and because, even if such a claim did apply to independent contractors, Plaintiff's allegations still fail to state a claim for which relief can be granted.

In his opposition, Plaintiff alleges for the first time that he is an employee of UTOPIA. Plaintiff cites to various Utah cases that provide factors to be weighed in considering whether a person is an employee or independent contractor.[52]  The Court is not persuaded that it should find Plaintiff to be an employee for purposes of this claim.

First, the Court notes that Plaintiff attempts to obtain the benefits of the Agreement as an independent contractor, while also availing himself of Utah statutory and common-law protections meant for non-contracted, at-will employees.  Plaintiff's employment relationship with Defendants was not at-will.  In *Touchard v. La-Z-Boy, Inc.*,[53] the Utah Supreme Court held that "[w]hen employment is at-will, either the employer or the employee may terminate the employment for any reason (or no reason) except where prohibited by law.  Accordingly, an

---

[52]*See Utah Home Fire Ins. Co., v. Manning*, 985 P.2d 243 (Utah 1999); *Petro-Hunt, LLC v. Dep't of Workforce Servs*., 197 P.3d 107 (Utah Ct. App. 2008).

[53]148 P.3d 945 (Utah 2006).

employer's decision to terminate an employee is presumed to be valid."[54]  In contrast, the method

for termination of Plaintiff's employment with Defendants was provided for in the Agreement.

Pursuant to the terms of the Agreement, Plaintiff cannot be discharged at-will by UTOPIA—or

any of the Defendants—and any termination before the termination date set out in the Agreement

is presumptively invalid.

Moreover, the facts of this case do not lend themselves to the purposes for which the

Utah Supreme Court has indicated the tort of wrongful termination in violation of public policy

exception exists.  In *Peterson v. Browning*,[55] the Utah Supreme Court held that an action for

wrongful termination in violation of public policy "is imposed by law, and thus is properly

conceptualized as a tort."[56]  In *Peterson*, the Court further explained:

> [i]n the case of the public policy exception, potential punitive damages will exert
> a valuable deterrent effect on employers who might otherwise subject their
> employees to a choice between violating the law or losing their jobs.  The
> employment-at-will doctrine does not grant an employer the privilege of
> subjecting its employees to the risks of criminal liability.[57]

Here, no such public policy exception is necessary nor, based on this Court's review of

relevant Utah case law, is it merited.  This reasoning is also in line with this Court's holding in

*IOSTAR Corporation v. Stuart.*[58]  In that case, this Court held "[t]he wrongful discharge doctrine

---

[54]*Id*. at 948.

[55]832 P.2d 1280 (Utah 1992).

[56]*Id*. at 1285.

[57]*Id*.

[58]2009 WL 270037.

grew out of a need to protect at-will employees, who are under the total control of the employer

and without separate or independent contractual rights that provide employment protections.  As

such, it does not protect independent contractors."[59]  Plaintiff's rights are provided for under the

Agreement.  Thus, the Court will proceed on the basis that Plaintiff is an independent contractor

and determine his rights per the Agreement.

     For the foregoing reasons, the Court will dismiss Plaintiff's fifth cause of action for

wrongful discharge in violation of public policy.

E.     PROMISSORY ESTOPPEL

     Plaintiff's sixth cause of action alleges that, based on Plaintiff's discussions with Mr.

Shaw and Mr. Marriott, Plaintiff had an expectation of employment with UTOPIA through May

15, 2012.  To support this claim, Plaintiff alleges that he forwent several job offers for the next

year based on his reliance on Defendants' representations.  Defendants argue that this claim

should be dismissed because UTOPIA never made a promise to renew the Agreement.

> In Utah, the elements of promissory estoppel are: '(1) The [promisee]
> acted with prudence and in reasonable reliance on a promise made by the
> [promisor]; (2) the [promisor] knew that the [promisee] had relied on the promise
> which the [promisor] should reasonably expect to induce action or forbearance on
> the part of the [promisee] or a third person; (3) the [promisor] was aware of all
> material facts; and (4) the [promisee] relied on the promise and the reliance
> resulted in a loss to the [promisee].'

---

[59]*Id*. at *18.

In addition, a promisee must support a promissory estoppel claim with more than a subjective understanding of the promisor's statements. The claim must show evidence of a reasonably certain and definite promise.[60]

Detrimental to Plaintiff's claim for promissory estoppel is the requirement of a reasonably certain and definite promise. In his Amended Complaint, Plaintiff has failed to point to a single statement made by any of the Defendants that the Agreement would be renewed for a subsequent year. Plaintiff has alleged that this was his subjective understanding based upon an alleged conversation with Mr. Shaw and Mr. Marriott. However, such is insufficient to maintain a claim for promissory estoppel. Plaintiff's subjective understanding based on an alleged conversation is not enough—without more specific facts as to an actual promise made by the Defendants—to estop the Defendants from allowing the Agreement to expire on May 15, 2011. For this reason, the Court will dismiss Plaintiff's claim for promissory estoppel.

F.      MOTION TO STRIKE

Plaintiff asserts that two paragraphs in a letter attached to Defendants' Motion to Dismiss as Exhibit A and also attached to Defendants' Answer to Amended Complaint as Exhibit A are redundant, immaterial, impertinent, or scandalous. For this reason, Plaintiff requests that this Court either: strike the offending letter attached to Defendants' Motion, or, strike the allegedly offensive paragraphs as redacted in Plaintiff's exhibit. Defendants contend that the Court should deny Plaintiff's Motion to Strike because (1) the letter constitutes Defendants' statutorily-

---

[60]*J.R. Simplot Co. v. Sales King Intern., Inc.*, 17 P.3d 1100, 1107 (Utah 2000) (quoting *Nunley v. Westates Casing Servs., Inc.*, 989 P.2d 1077, 1088 (Utah 1999)).

required response under the UGIA and (2) the Court should deny the Motion as moot because Plaintiff expressly alleges the accusations in his original Complaint.

Federal Rule of Procedure 12(f) provides that "the court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

The letter in question is not irrelevant or immaterial to the case, as is demonstrated by the fact that both parties attached a version of the letter to their pleadings before this Court.  Indeed, Plaintiff relies upon this letter to demonstrate compliance with the UGIA.  Nor is the letter redundant merely because Defendants attached an unedited version of the letter to their pleadings.

Plaintiff also argues that the paragraphs in question constitute scandalous matter.  Black's Law Dictionary defines scandalous matter as "matter that is both grossly disgraceful (or defamatory) and irrelevant to the action or defense."[61]  Courts that have applied Rule 12(f) and stricken scandalous matter have done so only where the material was of an extreme nature.[62]  The contents of this letter are not so extreme so as to render it scandalous matter.

Because the paragraphs in question do not meet the requirements of Rule 12(f), the Court will deny Plaintiff's Motion to Strike.

---

[61]BLACK'S LAW DICTIONARY 1345 (7th ed. 1999).

[62]*See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836 (10th Cir. 2005) (dismissing an appeal where it contained abusive and offensive language).

IV.  CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss as to Plaintiff's First, Second, Fifth, and Sixth claims and deny Defendants' Motion to Dismiss as to Plaintiff's Fourth claim.  Moreover, the Court will deny Plaintiff's Motion to Strike.  It is therefore

ORDERED that Defendants' Motion to Dismiss (Docket No. 19) is GRANTED IN PART and DENIED IN PART.  It is further

ORDERED that Plaintiff's Motion to Strike (Docket No. 27) is DENIED.  Moreover, the parties are

ORDERED to submit the remaining claims of breach of contract and violation of the covenant of good faith and fair dealing to a settlement conference.

DATED   October 18, 2011.


BY THE COURT:


_____
TED STEWART
United States District Judge

24